DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Sandusky County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, Shawne S., and awarding permanent custody of her children, Antonio C. and Angelica C., to appellee Sandusky County Department of Job and Family Services ("SCDJFS"). For the reasons stated herein, this court affirms the judgment of the trial court.
 {¶ 2} Appellant sets forth the following three assignments of error:
 {¶ 3} "Assignments of error
 {¶ 4} "I. The trial court erred as a matter of law when it made findings against the manifest weight of the evidence when it terminated the parental rights of appellant.
 {¶ 5} "II. The trial court abused its discretion and committed reversible error by terminating the parental rights and responsibilities of appellant by finding the children could not be returned to appellant within a reasonable amount of time.
 {¶ 6} "III. The trial court erred in awarding permanent custody to appellee when appellants (sic) were not afforded effective assistance of counsel."
 {¶ 7} The following facts are relevant to this appeal. Antonio was born in 1996, and Angelica was born in 1997, to appellant and Rudy C.[1]
Appellant and Rudy C. are not married. On December 15, 2000, SCDJFS filed a complaint alleging neglect and dependency in regard to the children. In the complaint, SCDJFS stated that the agency received a referral regarding the children being left alone and the children seeking out neighbors for food when hungry. During the investigation, concerns of physical hazards in the home and drug abuse and domestic violence developed. Another child[2] in the home, not part of this appeal, told the caseworker that Rudy had hit him; appellant admitted that Rudy had hit her and that there had been ongoing violence in the home. Rudy was arrested and ordered not to have contact with the children or appellant. In addition to the above concerns, the caseworker noted that both Antonio and Angelica had severe bottle rot. Appellant signed a safety plan on November 11, 2000, agreeing not to allow contact between Rudy and the children. On December 11, 2000, the caseworker learned that appellant had violated the safety plan by allowing Rudy back in the home. On December 15, 2000, a court appointed special advocate was appointed as guardian ad litem ("CASA") for the children.
 {¶ 8} An initial hearing was held on December 20, 2000, following which the children were placed in the temporary custody of their maternal grandfather. Rudy was permitted supervised visitation with the children. Separate counsel was appointed for appellant and Rudy.
 {¶ 9} The CASA submitted a report and recommendations on February 23, 2001, and recommended that the children be placed in the temporary custody of SCDJFS. On February 23, 2001, a combined adjudicatory and dispositional hearing was held; the parties consented to a finding of dependency, following which the children were placed in the temporary custody of their maternal grandmother with protective supervision of SCDJFS. Appellant and Rudy were ordered to pay child support. Following a dispositional review in June 2001, temporary custody was continued with the children's maternal grandmother with protective supervision of SCDJFS.
 {¶ 10} On September 4, 2001, SCDJFS filed a motion to modify custody from the maternal grandmother to appellant with protective supervision remaining with SCDJFS. Following a hearing on September 11, 2001, the motion was granted. Following an annual dispositional review hearing on December 3, 2001, protective supervision was continued for an additional six months; Rudy was ordered not to have any face to face contact with the children.
 {¶ 11} A motion for an emergency shelter care hearing was filed on December 17, 2001. Attached to the motion was the affidavit of the caseworker in which she stated that she had been informed by appellant's friends and relatives that appellant was at a crack house; that none of these friends or relatives could keep the children; and that the children had been dropped off at Erie County Child Services. An emergency shelter care hearing was held that day, following which the children were placed in temporary custody of SCDJFS. On March 4, 2002, a dispositional review hearing was held; the following was noted in the judgment entry: that appellant did not attend the hearing; that appellant was not complying with her case plan in not attending counseling, in failing to keep an assessment appointment, in not complying with drug testing, in not keeping employment, in living with Rudy, and in not maintaining contact th SCDJFS or her attorney. The children were continued in the temporary custody of SCDJFS.
 {¶ 12} On May 21, 2002, SCDJFS filed a motion to extend temporary custody of the children. On May 22, 2002, SCDJFS filed a motion for an order to show cause for appellant's failure to attend counseling and for testing positive for cocaine on four dates. On August 14, 2002, a dispositional review hearing was held, following which it was ordered that the children remain in the temporary custody of SCDJFS. The judgment entry noted that appellant was not in compliance with her case plan in not following treatment recommendations, not reporting for drug testing, in testing positive for cocaine on the dates she did report for drug testing and in not maintaining a residence.
 {¶ 13} Following an annual dispositional review hearing on November 4, 2002, the children were continued in the temporary custody of SCDJFS. The judgment entry noted that appellant was not in compliance with her case plan in that no reports demonstrating compliance with the treatments recommendations had been received. The CASA submitted a report and recommendation on November 4, 2002, and noted that appellant had tested positive for cocaine and, thus, was suspended from a counseling service. The CASA also noted that appellant had no stable residence, had not followed through on services, lacked parenting skills and responsibility, made promises to the children but did not follow through on these promises, and only provided meals during four of the past twenty-one visits with the children even though the visits were scheduled during meal times. The CASA recommended that appellant provide a meal during visits, that appellant have one scheduled telephone call per week in addition to the visit, and that appellant and Rudy pay for Karate lessons for Antonio as they had promised several times.
 {¶ 14} On November 14, 2002, SCDJFS filed a motion to modify temporary custody to permanent custody and for permanent custody. On February 7, 2003, appellant filed a motion for a change in custody from SCDJFS to her, arguing that it would be in the best interest of the children. She also filed a motion for an in camera interview of the children which was granted by the trial court. On February 14, 2003, SCDJFS filed a motion to amend its motion to modify temporary custody to permanent custody to indicate that the children had been in its custody for 12 or more months of a consecutive 22-month period.
 {¶ 15} On March 3, 2003, a hearing on the permanent custody motion was started; the hearing continued on March 4-7 and concluded on March 12, 2003. Neither appellant nor Rudy attended the first day of the hearing.
 {¶ 16} Susan Carney, the SCDJFS investigation supervisor, was the first witness to testify. Carney testified that there had been five investigations of this family since September 1998. In October 2000, the fifth investigation occurred. At that time, Carney interviewed the children, the parties and other witnesses. Carney discussed safety issues with appellant, supervision of the children, and domestic violence and developed a safety plan according to which appellant would not allow Rudy to have any contact with the children because of one child's report of abuse. Rudy was arrested for domestic violence against appellant. The complaint was filed, the children were placed with a family member with protective supervision of SCDJFS and services were initiated.
 {¶ 17} Charlotte Stonerook, a case manager from Sandusky County Treatment Alternatives to Street Crime ("TASC"), testified that appellant did her assessment with TASC on October 2, 2002, and the assessment included an in-depth interview of drug and alcohol usage, past emotional or physical problems and social activities. Stonerook concluded that appellant needed an intensive outpatient and alcohol program ("IOP"). Stonerook recommended that appellant attend two to three Alcoholics Anonymous ("AA") or Drug Addiction Anonymous ("DAA") meetings per week; that she find a sober support system; and that she find an AA sponsor. Stonerook testified that she helped with a housing referral and that appellant was scheduled for random urine drug tests ("U/As") and a six week IOP of three hours per session, three times per week. Stonerook also testified that appellant did not successfully complete her IOP at either of the two agencies where she was enrolled. Although Stonerook provided appellant with meetings times, dates and places, appellant never provided any verification of attendance at AA; appellant never obtained an AA sponsor.
 {¶ 18} In regard to drug testing, Stonerook testified that appellant tested positive for both cannabis and cocaine on December 17, 2001. Between December 24, 2001 and October 2, 2002, appellant was scheduled for 118 U/As; of these 118, appellant appeared only for 18 and of these 18, she tested positive for cocaine 6 times; for the other 100 scheduled U/As, appellant did not appear for testing and did not call. Of the 12 scheduled U/As between January 17, 2003 and February 28, 2003, appellant came in 7 times with no positives results; however, for the other 5 scheduled U/As, appellant did not appear for testing and did not call. Stonerook expressed concern for appellant because she has not come in to prove she is "clean," has not followed through with the drug and alcohol treatment, has not shown that she has a sober support system and has not shown that she has attended AA meetings.
 {¶ 19} On cross-examination, Stonerook admitted that since August 14, 2002, appellant had 31 negative U/As. Stonerook also admitted that these negative results were encouraging but qualified this statement by stating she would be more encouraged if appellant had shown up for every single U/A and tested negative.
 {¶ 20} On re-direct examination, Stonerook confirmed that appellant's last positive U/A was on August 14, 2002; that appellant was a no-show for testing from October 2, 2002 to January 17, 2003; and that appellant was a no-show for testing five times from January 17, 2003 to the date of the hearing. Stonerook also testified that there were gaps in appellant's testing between August 2002 and February 2003 during which appellant could have been using drugs. On re-cross-examination, Stonerook admitted that although appellant did not complete the entire six week IOP program, she did complete most of the six week program.
 {¶ 21} Rebecca Serrick, a drug and alcohol counselor with the Lutheran Social Services IOP, testified that both appellant and Rudy became part of that program in December 2002. The Lutheran IOP was a three hour, three times per week for six week program followed by twelve one and a half hour after care sessions; during these twelve weeks, each client is also seen for a one hour individual session. From December 4 through 23, 2002, appellant attended every Monday, Wednesday and Thursday. After December 23, however, she missed four nights and was dropped from the program per agency policy. Serrick described appellant as co-dependent and as having difficulty making decisions. Serrick also testified that although she thought appellant needed individual counseling to address her own issues, appellant felt she did not need it; Serrick also testified that appellant made very little progress while in the program. On cross-examination, Serrick testified that even if appellant had not missed any sessions, she would not have gone on to after care because she was not progressing in the program.
 {¶ 22} Beth Reichert, another counselor with the Lutheran Social Services, testified that Antonio and Angelica became her clients in October 2002; that Antonio and Angelica are currently her clients; and that she sees them together every other week. She diagnosed both children with an adjustment disorder, has worked with Angelica on her fears when her foster parents have been gone and on appropriate ways to respond when she does not get her way, and has worked with Antonio on appropriate ways to manage anger. Reichert testified that Antonio and Angelica are very close; that she has not met appellant; that she would not recommend family therapy as appellant has not complied with the case plan and would need to deal with drug and alcohol issues before family counseling; and that a timely resolution would be helpful to the children. Reichert also testified that Antonio and Angelica feel sad when their parents miss visitation, that their parents make promises that they do not follow through on, and that Reichert had safety or protection concerns if the children were returned to their parents as children of drug and alcohol addicts are not the parents' number one priority.
 {¶ 23} On cross-examination, Reichert testified that she thought it would be less traumatic for Angelica to have her parents' parental rights severed than for her to be harmed in the care of her parents. Reichert also testified that she would be very concerned about the children being reunified with their parents. Reichert testified that, because it has taken the parents two years to work on their issues and problems, she thought it would take a long time in family counseling for them to learn how to parent their children.
 {¶ 24} Cindy Franketti, the executive director of a supervised parenting center in Sandusky, testified next. She testified that the primary function is to supervise visitation of families referred from children services; that appellant started visiting the children there in January 2002; that appellant was scheduled for 104 visits and attended 90 and that the parents were late 30 out of 90 visits. Franketti also testified that the parents made promises to the children that they did not keep and that appellant has less patience than Rudy and would yell at the children and lose her patience when helping them with their homework. Franketti testified that appellant appeared under the influence of drugs during a visit in February 2003, and that the parents were not consistent in applying what they learned in parenting classes.
 {¶ 25} Linda Noftz, the foster mother for the children, testified that Angelica came to her in December 2002 at age four and Antonio came in April 2003 at age six. Linda testified that Angelica would act up after visits with her parents; that both children would act up if one of the parents did not show for a visit; that the parents have made promises to the children that they have not kept; and that the children become upset if the parents do not follow through on the promises. Linda also testified Angelica has not wanted to go to visits several times in the month before the hearing; that the children do not get timely responses to their questions of their parents; and that both children are doing well in school.
 {¶ 26} Wendie Parsons-Nuhn, a mental health and chemical dependency therapist who has worked with appellant since January 24, 2003, testified that appellant was diagnosed as cocaine dependent. Parsons-Nuhn recommended a treatment plan including an IOP of three hours, three times per week for six week program which appellant started on January 27, 2003. Parsons-Nuhn testified that appellant has attended ten of the fifteen sessions, called in three times as sick and did not show for two others. Parsons-Nuhn also testified that appellant has attended the once weekly AA meeting as required. Parsons-Nuhn testified that appellant has not yet worked on her individual problems or concerns.
 {¶ 27} An investigator for Sandusky County Child Support Enforcement Agency testified that although appellant has had a child support obligation of $50 per month per child since December 14, 2001, she did not work until June 2002, and stopped working on August 1, 2002. Appellant was employed again in October 2002, for another two months of support; however, appellant did not report her employment as required. Furthermore, appellant has never contacted the agency with address changes or other employment information and additionally, when not working, has not submitted the appropriate form indicating that she has looked for employment at 15 different places per month. Appellant has only paid child support sporadically.
 {¶ 28} Melanie Mischler, the CASA, testified that she was assigned as CASA on December 2000; that she met with the children for the first time on December 26, 2000; that she met with the parents for the first time on January 10, 2001; that neither Rudy nor appellant were working at that time; that Rudy told her he abused appellant's child from her marriage because he had been abused as a child; and that both Rudy and appellant shared with her that domestic violence was something they did to each other. The CASA also testified that the safety plan prohibited Rudy from living in the home or having unsupervised contact with the children and that the children were removed from appellant's custody because Rudy had been back in the home contrary to the safety plan. The CASA further testified that on one occasion, she went to the home and appellant was yelling and screaming at the children and would not let the CASA in so the CASA went to the police and when she and the police returned, no one answered the door.
 {¶ 29} The CASA also testified that initially she thought appellant viewed her as someone who could help and they communicated well until Rudy moved back to the area in December 2001. The CASA testified that the children went into foster care after appellant did not pick them up from the babysitter in December 2001. The CASA testified that she had trouble meeting with appellant and Rudy because they never have had permanent housing; that she attempted to met with the parents after their visits with the children but the parents would leave and at times did not show for visits. The CASA also monitored the visits between the parents and children either on video or during the actual visit. She testified that appellant does not interact a lot with the children but Rudy does; that appellant finds things to keep busy rather than sitting down with the children or doing their homework; that appellant loses her patience quickly and becomes easily frustrated with the children; and that appellant does not take a part in consoling the children when they are upset. The CASA also testified that she visited the children approximately two times per month; that the children were not well-behaved or respectful when she first became involved with them but they are now; that the children were angry and aggressive when she first became involved with them; that the children did not respond well to corrective discipline when she first became involved with them; and although Antonio was struggling in school when she first became involved with the children, he was doing very well now.
 {¶ 30} In terms of what the parents need to do for reunification, the CASA testified that she has concerns about the children's safety; that the parents need to exhibit better parenting skills and that the parents need to have employment, a stable residence and clean U/A's for six months to a year. The CASA testified that it would not be in the children's best interest and would be a travesty for the children to go back with their parents. The CASA recommended that the children go into an adoptive home.
 {¶ 31} On cross-examination, the CASA admitted that the termination of parental rights would have an impact on the children although she also testified that any change in their stability would be a severe impact. She also testified that the impact would be far less than if the children were returned to their parents.
 {¶ 32} A SCDJFS aide who worked with the parents since October 2002 testified; her role was to help the parents find housing and save money. She testified that she found an apartment and she took the completed application in for them. To be eligible for this apartment, the couple had to be homeless. However, Rudy was thrown out of the homeless shelter and appellant decided not to stay at the shelter even though she could have. They then went to live with friends and, thus, they were no longer homeless and were ineligible for the apartment. The aide also testified that appellant and Rudy kept only one of four scheduled appointments, did not contact her as they promised and ultimately, she closed their case. This aide was also to supervise a visit, but the parents did not show up and did not call. The aide was asked to provide transportation for the parents on the first day of the hearing when their car broke down. However, although she waited, the parents never called back as they said they would.
 {¶ 33} The case manager from a homeless shelter where the parents resided for six days in November 2002 testified. She testified that Rudy was asked to leave the facility because he was intoxicated in violation of the rules of the shelter and that appellant left when Rudy did even though she was not required to leave.
 {¶ 34} Lisa Mullholand, the ongoing SCDJFS caseworker for the family, testified that she was assigned the case in December 2000. She testified that initial services for appellant were individual counseling and parenting classes; that the children were first placed with their maternal grandfather and later with their maternal grandmother; and that she recommended places for Rudy to live so that the children could return to live with appellant. Lisa testified that appellant completed parenting classes, attended anger management counseling and obtained employment. Lisa testified that the children were returned to live with appellant in November 2001, with a safety plan prohibiting unsupervised contact between the children and Rudy.
 {¶ 35} Lisa testified that in December 2001, SCDJFS again obtained custody of the children when appellant did not pick them up from the babysitter. Appellant's case plan was amended to include a drug and alcohol assessment, random U/A's and individual counseling. Lisa testified that appellant has completed two sets of parenting classes and an anger management class but has not completed any IOP program, her individual counseling or obtained stable housing or employment. Lisa did concede that appellant is now living in a house but testified that appellant has a history of living in a place for only one to three months and moving many times. Lisa testified that SCDJFS would need at least six months to consider appellant's housing stable. The same is true for the job she has had for only a month. Lisa described appellant and Rudy's relationship as appellant being dependent and committed to Rudy which resulted in her making bad choices such as breaking the safety plans. In regard to appellant's interaction with the children, Lisa testified that both appellant and Rudy would make promises, such as bringing presents to the children, which they did not keep. Lisa testified that she talked with the parents and explained that they should not promise the children what they cannot do and that the quality time they spend with the children is more important than material things. Lisa also testified that SCDJFS was requesting permanent custody because of the failure of the parents to complete their services and to show that they are clean and sober.
 {¶ 36} On cross-examination, Lisa testified that she addressed her concern with both appellant and Rudy that they could lose their children if they did not complete their case plan. Lisa admitted that since November 2002, she has not seen appellant and Rudy under the influence of drugs or alcohol. Lisa testified that she did not think appellant and Rudy became serious about completing their services until SCDJFS filed for permanent custody.
 {¶ 37} Donna Kelley, a parent educator who taught a parenting class that appellant and Rudy attended in November 2002, testified that both completed the six session program. On cross-examination, Kelley admitted that watching parents interact with their children is not part of the program; that the only time she saw appellant and Rudy interact with their children was at the entrance interview; and that she has not seen appellant and Rudy since they completed their classes and, thus, could not whether they were applying what she taught them. Additionally, Kelley admitted she does not guarantee that a parent's ability to parent a children will improve as a result of the parenting class.
 {¶ 38} Kenneth Wolford, a clinical counselor who appellant saw for anger management counseling in 2001, testified that she completed her treatment with him. He testified that in his evaluation of her, he rated her willingness to cooperate with treatment and attendance as excellent and that in regard to progress, he felt appellant was aware of basic anger management concepts and how to avoid similar problems in the future. On cross-examination, he admitted that he has not seen appellant since June 2001 and he could not say how she is doing currently.
 {¶ 39} On direct examination, Sandra Grose testified that she, appellant and Rudy belong to the same church and became friends in January 2003. Sandra testified that they first met in November 2002, when appellant and Rudy came to the church. They lived with her for three weeks in January 2003, while they were waiting for their apartment to become available. Sandra testified that she and appellant work with different youth groups at the church; that appellant and Rudy have attended church almost every Sunday; that she is aware of the past drug and relationship problems that appellant and Rudy have had; that she has only seen Rudy drink one beer since she has known the couple; and that she would be willing to assist in supervising visitation between the parents and children. On cross-examination, Sandra admitted that she has never seen the couple interact with their children.
 {¶ 40} Robert Duncan, the minister of the church that Sandra, appellant and Rudy attend, testified that he has known appellant and Rudy for approximately three and a half to four months; that appellant and Rudy were open about the children and the problems in their lives; and that the church members were trying to help them make wise choices. On cross-examination, the minister testified that appellant and Rudy did not attend church the past Sunday and that Rudy did not attend church the Sunday before that.
 {¶ 41} David Tischler of Sandusky County TASC testified that on Thursday, March 6, 2003, during the hearing on the motion for permanent custody, both appellant and Rudy U/A's tested negative for cocaine and marijuana. The other U/A's tested during subsequent days of the hearing also tested negative for cocaine and marijuana.
 {¶ 42} Appellant testified that she is legally married to David Snow, the father of her oldest child who is nine and now in his father's custody; that she has been in a relationship with Rudy since 1995; that they separated for approximately nine months in 2001, during which time Rudy married another woman to whom he is still married; that he is the father of Antonio who is almost seven and Angelica who is almost six. Appellant also testified that she started a part-time job on February 20, 2003, working between 18 and 23 hours per week; that prior to this current job, she was employed in other positions for varying lengths of time between August 2002 and December 2002; that she was employed by one employer between April 2001 to February 2002; and that child support was taken from her paychecks. Appellant also testified that she and Rudy began renting a house at the end of January 2003, that they have a one year lease and are current on their rent.
 {¶ 43} In regard to the IOP requirement, appellant testified that although she started four different IOP programs, she was unable to complete a full IOP program. Appellant testified that she was unable to complete one IOP program because she had surgery, another because of work conflicts, a third due to transportation problems and that she just started another IOP program. Appellant also testified that she completed two parenting classes, one required under her case plan and a second she voluntarily took. Appellant also testified that she has taken responsibility toward her treatment and feels this makes her a better mother.
 {¶ 44} On cross-examination, appellant admitted that she did not report her employment to child support as she was required by court order; that she was not employed from December 4, 2002 until February 20, 2003; that she has lived in 15 different places since December 2000; and that she slept in her car a couple of nights. She admitted that when the children were in her mother's custody and she lived there, Antonio was frequently tardy or absent and that he needed improvement in his reading, language arts and math; she also admitted that another child was held back a grade because he missed so many days of school. Appellant admitted that it was not a good idea to tell the children that she did not have a car and had to walk everywhere. She also admitted that she would put off deciding an issue to which the children wanted an answer because she did not want them to cry during her visits. Appellant also admitted that she did better completing her services when Rudy was not there.
 {¶ 45} On March 26, 2003, the trial court granted permanent custody of the children to SCDJFS. Appellant filed a timely notice of appeal and appellate counsel was appointed.
 {¶ 46} In her first two assignments of error, appellant argues that the trial court's findings were against the manifest weight of the evidence and the trial court abused its discretion when it terminated her parental rights. This court finds no merit in these assignments of error.
 {¶ 47} In In the Matter of Baby Girl Doe, 149 Ohio App.3d 717,2002 Ohio 4470 at P 89, this court ruled that:
 {¶ 48} "On appeal from an order terminating parental rights, an appellate court will not reverse the trial court's judgment if, upon a review of the record, it determines that the trial court had sufficient evidence to satisfy the clear and convincing standard. In re Wise
(1994), 96 Ohio App.3d 619, 626. The `clear and convincing evidence' standard is a higher degree of proof than the `preponderance of the evidence' standard generally utilized in civil cases but is less stringent than the `beyond a reasonable doubt' standard used in criminal cases. State v. Schiebel (1990), 55 Ohio St.3d 71, 74. An appellate court will not substitute its own judgment for that of a trial court applying a `clear and convincing evidence' standard where some competent and credible evidence supports the trial court's factual findings. Id.; C.E.Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. (Parallel citations omitted.)"
 {¶ 49} On a motion for permanent custody based upon R.C.2151.413(D)(1), the court must "determine if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion." R.C. 2151.414(A)(1). The trial court must find by clear and convincing evidence that: 1) "it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody" and 2) that the agency has had temporary custody of the child for "twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999." R.C. 2151.414(B)(1) .
 {¶ 50} "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1).
 {¶ 51} The standard for determining the best interest of the child in permanent custody hearings is set by R.C. 2151.414(D).[3] The major factors to be considered, include, without limitation: the relationship of the child with others in his life; the child's wishes; how long the child has spent in custody; and the need for secure placement. See R.C.2151.414(D)(1) through (4).
 {¶ 52} In her arguments, appellant does not address the fact that her children were in the temporary custody of SCDJFS for more than 12 months straight. Appellant does not argue that the court erred when it found that permanent custody was in the children's best interests. Appellant focuses upon the application of R.C. 2151.414(E) and2151.415(E)(1). However, pursuant to R.C. 2151.414(B)(1), because the children were in temporary custody for more than 12 months, the trial court was only required to find by clear and convincing evidence that permanent custody was in the children's best interest. In re Nice (2001),141 Ohio App.3d 445, 459.
 {¶ 53} The trial court concluded that permanent commitment to SCDJFS was in the children's best interest. The record supports this decision. As set forth above, the witnesses at the hearing provided clear and convincing evidence that permanent custody was in the children's best interest.
 {¶ 54} Accordingly, appellant's first and second assignments of error are found not well-taken.
 {¶ 55} In her third assignment of error, appellant argues that she was denied effective assistance of trial counsel during the permanent custody hearing. Appellant asserts several instances of alleged ineffective assistance. This court finds no merit in this assignment of error.
 {¶ 56} The right to counsel, guaranteed in these proceedings by R.C. 2151.352 and by Juv.R 4, includes the right to the effective assistance of counsel. In re Heston (1998), 129 Ohio App.3d 825, 827. "Where the proceeding contemplates the loss of parents' `essential' and `basic' civil rights to raise their children, * * * the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force-the permanent, involuntary termination of parental custody." Id. See, also, In re Brodbeck (1994),97 Ohio App.3d 652, 657.
 {¶ 57} The two-part test for ineffective assistance of counsel outlined by the Ohio Supreme Court in State v. Ballew (1996),76 Ohio St.3d 244, 255, requires a showing that (1) counsel's performance was defective, and (2) the deficient performance prejudiced the result. Id. To prevail, a litigant must show that counsel's representation fell below an objective standard of reasonableness. Id. at 256-257. A litigant must also prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 257.
 {¶ 58} Furthermore, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in reviewing a claim of ineffective assistance of counsel. Strickland v. Washington (1984),466 U.S. 668, 689. See, also, State v. Carter (1995), 72 Ohio St.3d 545,558 ("To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy."). A trial counsel's choice of tactics must be given deference. State v. Nobles (1995), 106 Ohio App.3d 246, 276, discretionary appeal not allowed (1996), 74 Ohio St.3d 1510. A litigant bears the burden of proving that his trial counsel was ineffective. Statev. Martens (1993), 90 Ohio App.3d 338, 351.
 {¶ 59} Appellant first asserts that she was provided ineffective assistance of trial counsel when her trial counsel failed to make a continuous objection to the hearing continuing when appellant failed to appear. This court finds no merit in this argument.
 {¶ 60} After appellant's trial counsel voiced her objection to the hearing continuing in her absence, the trial court noted that appellant had been given notice of the hearing and that both parties were represented by counsel. Furthermore, SCDJFS notified the trial court that SCDJFS had contacted appellant the week before and offered assistance in transportation which appellant declined; that SCDJFS was attempting to contact appellant during the hearing; and that a SCDJFS aide was on "stand-by" to bring appellant to court once contact was made. Given the facts of the case sub judice, this court cannot find that appellant's trial counsel was ineffective for failing to make a continuing objection. Appellant's trial counsel did object to the hearing continuing. Thus, any further objection would have been futile and unnecessary. After appellant's trial counsel voiced her initial objection, this court must surmise that she made a tactical decision not to make a continuing objection. Mere errors of judgment regarding tactical matters or the fact that a better strategy may have been available do not substantiate a claim of ineffective assistance of counsel. Strickland, supra; State v. Clayton (1980), 62 Ohio St.2d 45,48-49. Thus, this court cannot find that appellant's trial counsel was ineffective for failing to make a continuing objection to the hearing continuing when appellant failed to appear.
 {¶ 61} Appellant next asserts that she was provided ineffective assistance of trial counsel when her trial counsel failed to ask for a bifurcated hearing regarding the permanent custody of the children and phrased her questions to some witnesses collectively as to appellant and Rudy, rather than individually as related to only appellant. Appellant argues that she and Rudy had opposing interests and that she "substantially competed" her case plan services but Rudy did not. This court finds no merit in this argument.
 {¶ 62} In regard to appellant's argument that she "substantially competed" her case plan services, this court finds, as did the trial court, that although appellant completed the parenting education classes, she has neither obtained stable housing nor stable employment. Furthermore, although appellant completed her drug assessment, appellant did not complete any of the four IOP programs that she started.
 {¶ 63} Specifically in regard to the failure to move to bifurcate the hearing, this court must surmise that appellant's trial counsel made a tactical decision not to file such a motion. As noted supra, mere errors of judgment regarding tactical matters or the fact that a better strategy may have been available do not substantiate a claim of ineffective assistance of counsel. Strickland, supra; State v. Clayton
(1980), 62 Ohio St.2d 45, 48-49.
 {¶ 64} Furthermore, appellant has failed to demonstrate any harm from not having a bifurcated hearing. The trial court's judgment entry clearly demonstrates that it was able to discern the evidence against each parent and was not influenced by the evidence against Rudy when it determined to terminate appellant's parental rights. Thus, this court finds that even if trial counsel's failure to move for a bifurcated hearing fell below an objective standard of reasonable representation, appellant was not prejudiced by this failure. Therefore, this court finds that trial counsel's failure to move to bifurcate the hearing did not constitute ineffective assistance of counsel.
 {¶ 65} Accordingly, appellant's third assignment of error is found not well-taken.
 {¶ 66} On consideration whereof, the court finds that substantial justice has been done the party complaining, and the judgment of the Sandusky County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
Peter M. Handwork, P.J., Mark L. Pietrykowski, J., Judith AnnLanzinger, J., Concur.
[1] On October 22, 2003, Rudy filed a motion to dismiss his appeal. On October 31, 2003, this court granted his motion to dismiss. Rudy is also known as Juan. As Rudy has been dismissed from this appeal, only evidence germane to appellant will be included.
[2] Appellant and the father of this child are married. During the course of these proceedings, this child was placed with his father.
[3] R.C. 2151.414(D) provides:
"(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 [2151.35.3] or division (C) of section2151.415 [2151.41.5] of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
"(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
"For the purposes of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."